# Illinois Official Reports

## Appellate Court

---

### *People v. Tates*, 2016 IL App (1st) 140619

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRY TATES, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-14-0619 |
| Filed | August 3, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-158002; the Hon. Thomas J. Byrne, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Chan Woo Yoon, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Kathryn F. Sodetz, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justices Fitzgerald Smith and Lavin concurred in the judgment and opinion. |

**OPINION**

¶ 1      On July 26, 2012, Terry Tates[1] was arrested after approximately 10 officers executed a search warrant at 505 West 62nd Street in Chicago, Illinois. Tates was jointly charged with Walter Tates (Walter)[2] and Robert Green, who were also arrested during the execution of the warrant. At a joint jury trial with Green,[3] Tates was convicted of possession with intent to deliver heroin, cocaine, and cannabis and simple possession of less than five grams of methamphetamines. He was acquitted of an armed violence charge. The jury acquitted Green of all charges. Tates was sentenced to 12 years in prison on the heroin and cocaine charges, 5 years on the cannabis charge, and 4 years on the methamphetamine charge, all to run concurrently.

¶ 2      On appeal, among other arguments, Tates contends that the State failed to meet its burden to prove guilt beyond a reasonable doubt because the evidence of Tates's possession of the narcotics located at the premises was insufficient. We agree and, therefore, reverse.

¶ 3                                  BACKGROUND

¶ 4      Around 4:45 p.m. on July 26, 2012, Officer Raymond Wilke and approximately 10 other officers approached a single family residence at 505 West 62nd Street to execute a search warrant. The warrant named Walter as the subject and did not reference either Tates or Green. Police announced their presence outside the residence by knocking on the front door and verbally identifying themselves. After receiving no response for several seconds, the officers then forced entry into the residence using a battering ram.

¶ 5      Officers spread both upstairs and into the living room, dining room, and kitchen, moving systematically to secure the building and locate any residents inside. Wilke, as the search lead, moved into the living room and then the dining room, where he saw Tates and Walter near the dining room table that held clumps of suspect narcotics and packaging materials. Wilke testified that (i) Walter was sitting at the dining room table, (ii) both Walter and Tates were sitting at the table, and (iii) all three individuals were in "the dining table area." The arrest report did not state that Tates was sitting at the dining room table upon entry. According to Wilke, all three individuals immediately ran from the room. There is no evidence that when police entered, Tates was touching or otherwise handling any of the materials on or around the dining room table. Tates and Walter were detained by perimeter officers outside the building, while Green was detained in the kitchen area; all of them were eventually secured in the kitchen while the police searched the residence.

¶ 6      It is disputed whether Green was present in the dining room at the time of the officers' entry. Wilke was unable to identify Green at trial and had difficulty recalling where Green was

---

[1]The defendant's name is spelled both with and without an "s" in the record. We accept his counsel's suggestions to use "Tates," as that is how defendant identified himself at a pretrial hearing.

[2]Based on the defendants' similar last names, it is reasonable to infer a familial relationship between Tates and Walter. At trial, one of the witnesses referred to Tates as Walter's brother; at oral argument, Tates's counsel represented that Walter is Tates's uncle. However, there is no competent evidence in the record that indicates the existence or nature of the relationship.

[3]Walter elected a bench trial, which was conducted simultaneously with Green and Tates's jury trial.

when police entered. Green's own testimony placed him and Tates outside the residence during the execution of the warrant.

¶ 7   In the residence, as noted, clumps of suspect cannabis were openly visible on the dining room table, along with bagged suspect cannabis, and paraphernalia for weighing and cutting narcotics. Plastic bags containing larger "ounce bags" of suspect cannabis were found inside various boxes, bags, and express mail containers on the floor of the dining room, along with packaging and mailing materials. A loaded Taurus .40-caliber handgun and a 9-millimeter magazine were found inside a closed credenza in the dining room. Although the magazine was not the appropriate ammunition for the loaded handgun found in the credenza, officers did not find another gun using 9-millimeter ammunition.

¶ 8   Other locations in the house also yielded various quantities of suspect drugs, both in plain view and hidden. In the kitchen, officers recovered heroin from the refrigerator; baking soda and a strainer containing white residue later found to be drug residue from the kitchen sink; and suspect crack cocaine, heroin, and methamphetamines from a compartment in the kitchen water cooler. Officer Donnell Crenshaw, the officer responsible for inventorying the recovered evidence, testified that approximately 700 bags of cannabis in various amounts were recovered. Several of the baggies of suspect cannabis were marked with a Nike-style swoosh symbol, which officers later explained connoted specific brands of cannabis. The parties stipulated that the drugs recovered consisted of: 227.3 grams of heroin, 139 grams of cocaine, 2070.3 grams of cannabis, and 0.5 grams of methamphetamine.

¶ 9   The officers did not call for an evidence technician, and no fingerprints or DNA evidence were collected. No indicia of residency was found linking Tates to the location. Both Green and Tates gave other addresses as their home address, and no evidence in the record contradicts this information.

¶ 10   In statements made to arresting officers at the Area 2 police station, Walter admitted ownership of all of the narcotics and related paraphernalia. His statements, excluding references to gang activity, were permitted to be used during cross-examination of Wilke. Walter told police:

> "I didn't know you guys were coming ***. This is what happens when you're in the game. You guys do your thing, and we do ours! I don't hate you. I make mine sellin'. Well, you know I got caught. You got me. You [got] your big bust. I got responsibilities too. I sell that s*** to take care of my kids and my momma.
>
> I put the s*** in heat sealed bags and use Express Mail bags so it looks like a legit business. I still can't believe it, you got me just coming in. I'm usually in and out and you had perfect timing. I just got that s*** in [*sic*] could not be better, so you got your little bust. I'm in and out so fast that I never get caught in my sister's house."

When asked during trial, Wilke did not know who Walter was referring to when he used the word "we." Walter never referenced Tates or Green in his statement.

¶ 11   Green elected to testify. In the early afternoon of July 26, Green met Tates, a childhood friend, by chance in a fast food restaurant. After getting their food, Tates asked for a ride to a location a few blocks away. Green denied that he knew the owner of the residence, stating that Tates did not indicate who owned the residence. Green had never been to 505 West 62nd Street before the day of the arrest.

¶ 12    When Tates and Green arrived, they took their food to the side yard, intending to sit at a picnic table. Before they could sit down, several police officers, with weapons drawn, entered the yard and ordered Green and Tates to lie on the ground. The two were eventually brought inside of the residence and searched. Approximately 10 minutes later, Walter was brought into the kitchen through the front door, where the three of them waited for about 2 hours before being taken out of the house. Green denied knowing Walter before the incident and claimed he had no knowledge of the narcotics found in the residence.

¶ 13    No weapons, drugs, or money were found on Tates's person, and officers noted in the arrest report that he was considered unarmed. Wilke did not see either Green or Tates touch the weapon or ammunition found in the credenza.

¶ 14    After being advised that it could consider Green's testimony as evidence in Tates's case, the jury found Tates guilty of the narcotics offenses but acquitted him of armed violence. As noted, Green was acquitted of all charges.

¶ 15                              ANALYSIS

¶ 16    Tates argues that the State failed to prove that he possessed any of the drugs recovered and thus failed to meet its burden of guilt beyond a reasonable doubt. Tates suggests that because the question is purely legal and relies on whether settled facts meet a reasonable doubt standard, rather than the credibility of the witnesses, our review should be *de novo*. See *In re Ryan B.*, 212 Ill. 2d 226, 231 (2004) ("[b]ecause respondent's challenge to the sufficiency of evidence against him does not question the credibility of the witnesses, but instead questions whether the uncontested facts were sufficient *** our review is *de novo*"); *People v. Smith*, 191 Ill. 2d 408, 411 (2000) ("Because the facts are not in dispute, defendant's guilt is a question of law, which we review *de novo*."). The State advocates a manifest weight of the evidence standard, arguing that it is not the place of the reviewing court to retry the defendant when considering the sufficiency of the evidence. *People v. Wittenmyer*, 151 Ill. 2d 175, 191 (1992); *People v. Boclair*, 129 Ill. 2d 458, 474 (1989). We agree with the State.

¶ 17    Where the evidence "produces conflicting inferences, the trier of fact resolves the conflict." *People v. Pryor*, 372 Ill. App. 3d 422, 430 (2007) (citing *People v. McDonald*, 168 Ill. 2d 420 (1995)). A question regarding the sufficiency of the evidence based on the factual findings of a jury presents a question of fact and not law. *Id.*; see *People v. Brown*, 277 Ill. App. 3d 989, 998 (1996) ("Knowledge and possession are factual issues, and the trier of fact's findings on these questions will not be disturbed unless the evidence is so unbelievable, improbable, or palpably contrary to the verdict that it creates a reasonable doubt of the defendant's guilt." (citing *People v. Luckett*, 273 Ill. App. 3d 1023 (1995))). The appropriate question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 18    It is the reviewing court's duty to examine the evidence while giving due consideration to the fact that the jury and trial court heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) (citing *People v. Smith*, 185 Ill. 2d 532, 541 (1999)). A reviewing court will not reverse a conviction unless the evidence is so contrary to the verdict, or so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt regarding defendant's guilt. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 48 (citing *People v. Evans*, 209 Ill. 2d 194,

209 (2004)). But if the court is of the opinion that the evidence is insufficient, reversal is required. *People v. Scott*, 367 Ill. App. 3d 283, 285 (2006) (citing *Smith*, 185 Ill. 2d at 541).

¶ 19     To support a conviction for possession of a controlled substance, the State must prove that the defendant had knowledge of the presence of the narcotics and that the narcotics were in the defendant's immediate and exclusive control. *Id.*; *People v. Ray*, 232 Ill. App. 3d 459, 461 (1992). Possession can be either actual or constructive. *People v. Adams*, 242 Ill. App. 3d 830, 832 (1993). No evidence was adduced at trial that Tates was actually in possession of any of the narcotics recovered, and therefore, we confine our analysis to the sufficiency of the evidence to demonstrate Tates's constructive possession.

¶ 20     Constructive possession does not require actual present dominion over the substance but can be inferred through an "intent and capability to maintain control and dominion." *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992). Control of the location where the contraband is found is not essential to support a conviction based on constructive possession. *People v. Minniweather*, 301 Ill. App. 3d 574, 578 (1998) (citing *People v. Adams*, 161 Ill. 2d 333, 345 (1994)). A defendant's lack of control of the premises will not preclude a finding of guilt if the circumstantial evidence supports an inference that the defendant intended to control the contraband inside. As we stated in *Minniweather*:

> "While it is well settled that 'where narcotics are found on premises under defendant's control, it may be inferred that the defendant had both knowledge and control of the narcotics' [citation], the inverse inference does not follow. Where narcotics are found on premises that are *not* under the defendant's control, defendant's control of the premises is not dispositive. Rather, it is defendant's relationship *to the contraband* that must be examined." (Emphases in original.) *Id.*

See also *Adams*, 161 Ill. 2d at 345 (defendant's lack of control of premises—an airplane restroom—did not preclude a finding of guilt where defendants' suspicious movements in and out of the restroom where narcotics were found supported an inference of constructive possession). Where there is no evidence that the defendant controls the premises, proof of mere presence, even combined with defendant's knowledge of the presence of narcotics, will not support a finding of constructive possession unless there is other circumstantial evidence of defendant's control over the contraband. *Brown*, 277 Ill. App. 3d at 998; *Scott*, 367 Ill. App. 3d at 285; see also *People v. Strong*, 316 Ill. App. 3d 807, 812 (2000) (evidence that defendant fell asleep beside a container containing cocaine not sufficient to establish constructive possession when he was but one guest of several at the residence and engaged in no activity that suggested control over the drugs).

¶ 21     Our decision in *Brown* illustrates the quantum of evidence that is both sufficient and insufficient to prove constructive possession. The defendant in *Brown* was arrested after police entered by force an apartment where the defendant was present but did not live. Defendant had concealed himself in a hidden crawl space in the apartment that was inaccessible either by stairs or by a ladder. He had also used a blanket obtained from the apartment to cover the entry to the crawl space. In close proximity to defendant in the crawl space when he was arrested were brown plastic shopping bags of narcotics and a cache of weapons. As to the narcotics and weapons in the crawl space, the court found that the circumstantial evidence of defendant's knowledge of the existence of the crawl space, his ability to access it and disguise the opening as well as his proximity to the contraband supported the inference that defendant "acted to

conceal the contraband along with himself and that he therefore had constructive possession" of the contraband. *Brown*, 277 Ill. App. 3d at 998.

¶ 22 In addition to the contraband in the crawl space in *Brown*, police located other narcotics in a combination safe in the apartment's kitchen. Defendant was never seen by the officers in the vicinity of the safe, and no evidence suggested that defendant possessed the combination to the safe or exercised control over its contents. We found this evidence insufficient to establish defendant's constructive possession of the safe's contents and thus reversed his convictions for possession of the narcotics found there. *Id.* at 999.

¶ 23 Also apposite is our decision in *Adams* where the defendant was found guilty of possession of a controlled substance after he was found standing in an apartment bathroom during a police raid. *Adams*, 242 Ill. App. 3d at 831. The defendant immediately complied with police instructions to lie down on the ground. After searching the bathroom, police found a gun and cash in plain view in the bathtub. They also located several packets of what was later identified as cocaine in a bucket of water placed in a cabinet below the sink and several packets of cocaine in the freezer of the refrigerator. We found this evidence insufficient to establish defendant's constructive possession of the cocaine in either the bathroom or the refrigerator, as there was no evidence linking defendant—a guest of the house—to the narcotics. *Id.* at 832-33. No evidence showed that defendant had been inside of the cabinet prior to or during police entry, and defendant's mere presence in the bathroom was not deemed sufficient to sustain his convictions. *Id.*

¶ 24 With these principles in mind, we address Tates's challenges to the sufficiency of the evidence in this case. First, there is no evidence that Tates exercised control over the premises such that a trier of fact could reasonably infer his knowledge and control over the narcotics located there. *Minniweather*, 301 Ill. App. 3d at 578. No evidence connected Tates to 505 West 62nd Street and other than the fact that we could presume he was familiar with the location based on Green's testimony that Tates asked him for a ride there, no evidence suggests that Tates exercised any modicum of control over the premises. Many of our decisions explain that some tangible form of ownership must be proved in order to support a presumption of defendant's control over the location where drugs are found, even if the defendant is found on the premises. Compare *People v. Cunningham*, 309 Ill. App. 3d 824 (1999) (evidence of residency, and thus control of the premises, deemed sufficient where defendant had keys to the house, listed the address on his driver's license, and lived and received mail at the residence), with *People v. Blue*, 343 Ill. App. 3d 927 (2003) (evidence of control insufficient where there were no bills, rent receipts, pieces of clothing, or mail addressed to the defendant at the location); *People v. Maldonado*, 2015 IL App (1st) 131874, ¶¶ 27-29 (evidence of control insufficient where delivery receipt, one piece of junk mail, and one unidentifiable piece of mail had name of defendant and wife as the addressee at the location). Given the lack of any evidence linking Tates to the residence, the State was required to adduce circumstantial evidence of Tates's exercise of control over the contraband located there.

¶ 25 Initially, we note that Tates's reliance on Walter's statement, standing alone, as evidence of Tates's lack of control over the narcotics is misplaced. Exclusive control can include joint possession—if two or more people share immediate and exclusive control, or share the intention and power to exercise control, they each maintain possession. *People v. Hill*, 169 Ill. App. 3d 901, 913-14 (1988); *People v. Scott*, 152 Ill. App. 3d 868, 871 (1987). Consequently,

it was possible for both Tates and Walter to maintain possession of the narcotics, even if Walter openly claimed ownership.

¶ 26 But even though Walter's statement does not necessarily exonerate Tates, it does bear on the issue and other considerations warrant a finding that the State did not prove Tates's constructive possession of the narcotics. Whether Tates was standing in the dining room or sitting at the dining room table when police executed the warrant, no evidence establishes that police observed him touching or otherwise handling the cannabis or other materials on and around the dining room table. Wilke did not find any drugs or weapons on Tates's person, and no forensic evidence, such as fingerprints, linked Tates to the location or to the narcotics found there. Walter's statement, with its single reference to "we" ("You guys do your thing, and we do ours") is likewise insufficient to connect Tates to the drugs.

¶ 27 At oral argument, the State emphasized the volume of cannabis and related packaging materials in the dining room as circumstantial evidence of Tates's involvement in the presumed distribution operation. But no case has turned on the volume of drugs or drug paraphernalia present as indicative of a defendant's constructive possession where no other evidence connects the defendant to the contraband. Thus, while we could find, based on the quantity of cannabis and packaging materials present in the dining room, that Tates must have been aware of Walter's drug operation, nothing else supports the inference that Tates was constructively in possession of the drugs.

¶ 28 Thus, at most, the State established Tates's presence in the residence and his awareness of the presence of cannabis in the dining room. This is insufficient to prove his constructive possession of that contraband. And as in *Brown*, nothing in the record establishes any connection whatsoever between Tates and the heroin, cocaine, and methamphetamines recovered from other rooms in the apartment.

¶ 29 While evidence of constructive possession is often wholly circumstantial (*Minniweather*, 301 Ill. App. 3d at 580 (citing *People v. Newman*, 211 Ill. App. 3d 1087, 1093 (1991))), the scant additional circumstantial evidence argued by the State does not change the result. The fact that Tates attempted to flee when police used a battering ram to break down the front door, while probative, cannot, standing alone, satisfy the State's burden to prove his constructive possession of the narcotics beyond a reasonable doubt. This is particularly true given the lack of any evidence connecting him to the narcotics other than his presence in the dining room. Although evidence of flight may be relevant to infer a defendant's consciousness of guilt (*People v. Fleming*, 2014 IL App (1st) 113004, ¶ 53 (quoting *People v. Foster*, 198 Ill. App. 3d 986, 993 (1990))), mere presence at the scene, even coupled with flight, is not enough to satisfy the State's burden of proof. *People v. Jones*, 278 Ill. App. 3d 790, 793 (1996).

¶ 30 The State also argues that Tates's knowledge of the presence of narcotics may be inferred based on his failure to answer the door when the police announced themselves. But since there is no evidence that Tates resided at the address, we find it unremarkable that he would refrain from answering the door.

¶ 31 In sum, no evidence in the record before us satisfies the State's burden to show Tates's immediate and exclusive control over the narcotics. The evidence and reasonable inferences that can be drawn therefrom do not support the jury's verdicts on the narcotics charges as there is no evidence—even circumstantial—that Tates was aware of the narcotics hidden in the water cooler and refrigerator and no evidence, other than (i) Tates's presence in the dining room where cannabis was in plain view and (ii) his flight from police, to demonstrate his

constructive possession of that contraband. Because the evidence is insufficient to satisfy the State's burden of proof beyond a reasonable doubt, we reverse Tates's conviction outright. *Brown*, 2013 IL 114196, ¶ 53.

¶ 32          Reversed.