2020 IL App (1st) 172160-U

No. 1-17-2160

Order filed March 16, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 01933 |
| | ) | |
| ALEXANDER GARCIA, | ) | Honorable |
| | ) | Mauricio Araujo, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PIERCE delivered the judgment of the court.
Justices Hyman and Walker concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's convictions for possession of a controlled substance with intent to deliver are affirmed where the evidence presented was sufficient to prove that he constructively possessed the cocaine and MDMA recovered from an apartment during the execution of a search warrant.

¶ 2   Following a jury trial, defendant Alexander Garcia was convicted of possession of a controlled substance with intent to deliver 15 grams or more but less than 100 grams of cocaine (720 ILCS 570/401(a)(2)(A) (West 2014)) and possession of a controlled substance with intent to

deliver less than 5 grams of methylenedioxy-methamphetamine (MDMA) (720 ILCS 570/401(d) (West 2014)). He was sentenced to concurrent terms of eight and two years' imprisonment respectively. On appeal, defendant contends that the State failed to prove beyond a reasonable doubt that he possessed the controlled substances recovered from the apartment during the execution of a search warrant. For the following reasons, we affirm.

¶ 3    Defendant was charged by indictment with three counts of possession of a controlled substance with intent to deliver (720 ILCS 570/401 (2014)) and one count of possession of cannabis with intent to deliver (720 ILCS 550/5(d) (West 2014)).[1] Prior to trial the State *nolle prosequi* one count of possession of a controlled substance with intent to deliver and the possession of cannabis with intent to deliver count. Defendant elected to have his case proceed to a jury trial.

¶ 4    The evidence adduced at trial showed that on December 19, 2014, about 1 p.m., members of the Chicago police department executed a search warrant at an apartment on the 2600 block of North Burling Street. Chicago police officer Salvador Esparza Jr., a ten and a half year veteran police officer, testified that he, along with ten other officers and one sergeant, went to the apartment located in a residential area of Lincoln Park. The warrant was for a basement or "garden apartment." Esparza identified a sketch of the layout of the apartment drawn by one of his team members. The apartment consisted of a living room, two bedrooms, a kitchen and a bathroom. Esparza was the "breach officer" and his responsibilities included knocking on the door to the apartment, announcing his office, and entering the apartment. Esparza also was the officer responsible for the recovery of evidence found inside the apartment.

---

[1]  Co-defendant Joshua Rodriguez was also similarly charged but is not a party to this appeal.

¶ 5 When the officers arrived at the apartment to execute the warrant, Esparza knocked on the door, announced his office and waited for a response. After failing to get one, he used a "battering ram" to knock down the door. Once inside, he observed defendant in the living room. Esparza's team members called for him to breach a closed bedroom door, which was to the right of the living room. Inside that bedroom, was co-defendant Joshua Rodriguez.

¶ 6 A search was conducted of the apartment. During his testimony, Esparza identified photographs of the evidence recovered. In the living room area, on a table, Esparza recovered "loose cannabis, a glass metal pipe which is used to smoke cannabis" and a scale "used to weigh items, preferably smaller items like narcotics." There were also two pieces of mail addressed to defendant at the Burling address: a Commonwealth Edison bill with a due date of December 3, 2014 and a LINK card with a page of pre-printed instructions. In the bedroom where Rodriguez was found, Esparza recovered pieces of mail with Rodriguez's name and various addresses, none of which were the Burling apartment.

¶ 7 Esparza also searched a second bedroom with the door open and found a safe that was closed but unlocked next to a bed. Inside the safe, he found a container. In the container was a "large chunk or brick of cocaine" and next to it was a single bag containing eight knotted bags of cocaine. "Molly" was also recovered from inside the safe which Esparza explained is a suspect narcotic also referred to as "ecstasy." From the top of a nightstand next to the bed, Esparza recovered a purple container with cannabis. He also recovered clothing inside the bedroom, including a pair of pants. Inside the pants pocket, he found a wallet that contained a State of Illinois identification card bearing defendant's name and keys that fit the door to the apartment. In the kitchen area, he found a large scale on top of the refrigerator, "a lot of sandwich bags" inside a

container and two bottles of a "cutting substance" that is used to dilute cocaine. Esparza testified that based on his experience the narcotics found in the safe were "going to be used for sale" and not for personal use.

¶ 8     On cross-examination, Esparza testified he was the last person to enter the apartment and saw defendant, who was handcuffed, standing inside the apartment. Esparza did not take any fingerprints from the apartment. He found the keys to the apartment next to the pair of pants that contained defendant's wallet in the pocket. The Illinois identification card had defendant's name on it but listed a different address. Esparza did not find any money in the apartment. He testified the drugs recovered from the apartment could have belonged to co-defendant.

¶ 9     Chicago police officer Mark Nash testified that on December 19, 2014, he was assigned to a tactical team in the 19th police district. In his 16 years as a Chicago police officer, Nash made hundreds of narcotic arrests including arrests for cocaine and Ecstasy. In his experience, cocaine and Ecstasy are "typically sold in small bags with marking[s] on them to identify the person who is selling them."

¶ 10    At approximately 1 p.m., Nash and his fellow officers executed a search warrant at an apartment on the 2600 block of North Burling. Nash was a "security officer" whose responsibilities included securing any individuals located inside the residence. His secondary duty was to serve an evidence officer and inventory any evidence collected from the apartment. Nash identified defendant in court as one of the individuals he saw in the apartment on December 19.

¶ 11    Upon completion of the search warrant, Nash and his team relocated to the 19th District where he inventoried the items recovered from the apartment. He described the large brick of cocaine from the plastic bag as being able to be "cut into smaller pieces." He described the second

bag of cocaine that was knotted into smaller bags as being "used to sell and not for personal consumption." He explained that the ecstasy or "molly" would also be "cut" and sold.

¶ 12    Laneen Blount, a forensic scientist with the Illinois State Police, testified as an expert in the area of forensic chemistry. She stated that the large chunk recovered from the safe weighed 47.886 grams and tested positive for cocaine.[2] The second substance recovered from the safe in the apartment weighed 3.559 grams and tested positive for methylenedioxy-methamphetamine (MDMA). She explained that "MDMA is called ecstasy on the street" and is sometimes referred to as "molly." She identified the eight bags that were recovered from the safe in the apartment and determined that the contents weighed 9.348 grams and tested positive for cocaine. Lastly, Blount testified that the two plastic bags, one containing a white powder and the second containing five clear capsules had a net weight of 3.487 grams of powder and tested positive for cocaine. Blount weighed one of the five capsules and found it weighed .102 grams but did not test positive for a controlled substance.

¶ 13    Defendant called Chicago police officer Gabriel Garcia, who testified that he was the first entry officer into the apartment after the door was breached. Garcia found defendant in his boxer shorts asleep on the couch. Garcia detained defendant and placed handcuffs on him. Garcia testified defendant was cooperative and respectful.

¶ 14    Defendant testified that he is 32 years old and works at Guaranteed Rate Field as a portable vender. He has been working there since 2011. On the date in question, defendant was living "off and on" in an apartment on the 2300 block of West 18th Street and spent "75 percent" of his time

---

[2] Blount testified there were four pills in the bag with the large chunk of cocaine. She used a reference and found the pills to be Alprazolam, commonly referred to as Xanax. She did not test the pills because they were a lesser scheduled drug and it was not necessary to analyze them. Defendant was not charged with possessing the pills.

at his mother's home on the 3500 block of West 61st Street. He denied living "legally" at the address on Burling. He tried to procure a lease for the Burling address, but it was under foreclosure and a "real dump." He explained that he tried to "fix it up" and was able to "put the light[s] on" and have working heaters in the apartment. He acknowledged the electric bill under his name because "no one else had the credit to do it." He slept at the apartment whenever he could because he could not stay with his mom and did not "feel like a man living with [his] mom." He worked at the Burling address "two or three times a week." Defendant "committed" with someone to fix up the apartment and they became "the maintenance man for the building, the superintendent." Defendant and co-defendant used the apartment as did "over a dozen people within a two-year period." He explained that if "anyone needed a place to stay that was the place." Defendant tried to make the apartment "a legitimate household" so that "if anybody needed a place to hang out or sleep, that was a safe place to sleep." The people that stayed in the apartment were "industry" people that worked in bars as bar backs, servers, or baristas.

¶ 15    On December 18, 2014, defendant and co-defendant went out for drinks. Defendant arrived at the Burling address and fell asleep on the couch. He did not know how he got to the Burling address or what happened to his clothes. Defendant testified that the room where his pants were recovered by the police was not his room and the keys the officers found were not his keys. He did not know how the keys and his wallet ended up near each other. He awoke to a "big thump" and saw police officers in the door. He testified that last time he "stepped into the corridor space" in the apartment was a week prior but could not remember the last time he was inside the apartment. He did not see any drugs or drug paraphernalia or scales in the apartment. Defendant testified that he only had marijuana for "personal use." He denied possessing or selling cocaine or MDMA. He

testified co-defendant had a room in the apartment and would keep the door locked. Defendant never went into co-defendant's room.

¶ 16    On cross-examination, defendant testified that the police officers, upon entering the apartment, sat him down on the couch. He identified a photograph of the living room and the couch he was sleeping on when the police entered the apartment. From one of the photographs defendant identified a cat and testified "that's my cat." He explained that the cat's name was "My Cat" or "Mi Gato" and belonged to his friend. Defendant acknowledged that he would feed the cat and that there was cat food in the apartment. He identified a LINK card with the address of the Burling apartment and an envelope with his name. He was not sure if there was a safe in the apartment and did not know what cocaine looked like before the search warrant was executed. He testified that he had been in the apartment to work on it on at least 20 previous occasions. He "slept there or stood there, hang out, left about 15, 20 times" but did not have keys to the apartment. He explained that everyone paid the ComEd bill and he would "pitch in a little bit." He was able to use the internet in the apartment from a free Wi-Fi connection. He acknowledged that at one point his name was on the gas bill. Defendant never paid rent for the apartment and the superintendent of the building gave co-defendant the keys to the apartment. Defendant brought a table into the apartment but did not have any furniture. Defendant had a flat screen television delivered to the apartment that he was going to sell to co-defendant. Defendant acknowledged the room where the safe was recovered had water damage and garbage cans were placed under the water leak to catch the water. Defendant also placed a dehumidifier in the room.

¶ 17    On redirect examination, defendant testified that he used the address of the apartment to procure a LINK card because his mother had a LINK card at her address. He reiterated that he did

not have a key to the apartment and would enter the apartment through the back door because it was broken. He did not recognize the safe recovered by the police.

¶ 18    After closing arguments, the jury found defendant guilty of both counts of possession of a controlled substance with intent to deliver. Defendant's motion for new trial was denied. After hearing arguments in aggravation and mitigation, the court sentenced defendant to eight years' imprisonment for possession of cocaine with intent to deliver and a concurrent term of two years for possession of MDMA with intent to deliver.

¶ 19    On appeal, defendant contends that his convictions should be reversed because the State failed to prove beyond a reasonable doubt that he possessed the narcotics recovered from the apartment.

¶ 20    The standard of review on a challenge to the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler,* 226 Ill. 2d 92, 114 (2007). This standard is applicable in all criminal cases regardless of whether the evidence is direct or circumstantial. *People v. Herring,* 324 Ill. App. 3d 458, 460 (2001); *People v. Campbell,* 146 Ill. 2d 363, 374-75 (1992). The trier of fact is responsible for assessing the credibility of the witnesses, weighing the testimony, and drawing reasonable inferences from the evidence. *People v. Hutchinson,* 2013 IL App (1st) 102332, ¶ 27; *People v. Ortiz,* 196 Ill. 2d 236, 259 (2001). When considering the sufficiency of the evidence, it is not the reviewing court's duty to retry the defendant. *People v. Beauchamp,* 241 Ill. 2d 1, 8 (2011); *People v. Collins,* 106 Ill. 2d 237, 261 (1985). The State must prove each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). A reviewing court will only reverse a

criminal conviction when the evidence is so improbable or unsatisfactory that there remains a reasonable doubt as to the defendant's guilt. *Beauchamp,* 241 Ill. 2d at 8; *People v. Collins,* 214 Ill. 2d 206, 217 (2005).

¶ 21     In this case, defendant was found guilty of possession of a controlled substance with intent to deliver. In order to sustain defendant's conviction, the State was required to prove beyond a reasonable doubt that he had knowledge of the presence of narcotics, that the narcotics were in his immediate possession or control, and that he intended to deliver the narcotics. 720 ILCS 570/401 (West 2014); *People v. Robinson,* 167 Ill. 2d 397, 407 (1995).

¶ 22     Defendant does not dispute the intent to deliver element of the offense. Rather, he argues that the State failed to prove he possessed the narcotics recovered during the execution of the search warrant. Specifically, he argues that the State failed to establish that he constructively possessed the narcotics because it did not show that he had dominion and control over the bedroom where the narcotics were recovered.

¶ 23     Possession is a question of fact to be resolved by the trier of fact. *People v. Carodine,* 374 Ill. App. 3d 16, 25 (2007). Possession, for the purposes of the offenses for which defendant was found guilty may be actual or constructive. *People v. Hannah,* 2013 IL App (1st) 111660, ¶ 28. In this case, because defendant did not physically possess the narcotics recovered when the officers executed the search warrant, the State proceeded on the theory that he constructively possessed them. In order to prove beyond a reasonable doubt that defendant was in constructive possession of the contraband, the State was required to show that he had knowledge of the presence of the contraband and exercised immediate and exclusive control over the area where the narcotics were found. *People v. Nesbit,* 398 Ill. App. 3d 200, 209 (2010).

¶ 24    Knowledge may be shown by evidence of a defendant's acts, declarations, or conduct from which it can be inferred that he knew the contraband existed in the place where it was found. *People v. Sams,* 2013 IL App (1st) 121431, ¶ 10. Evidence of constructive possession is often established by circumstantial evidence. *People v. McLaurin,* 331 Ill. App. 3d 498, 502 (2002). In determining whether constructive possession has been shown, the trier of fact "is entitled to rely on an inference of knowledge and possession sufficient to sustain a conviction 'absent other factors that might create a reasonable doubt as to the defendant's guilt.' " *People v. Alicea,* 2013 IL App (1st) 112602, ¶ 24 (quoting *People v. McCarter,* 339 Ill. App. 3d 876, 879 (2003)).

¶ 25    After reviewing the evidence in the light most favorable to the State, we find that the evidence presented was sufficient to support the trier of fact's determination that defendant constructively possessed the narcotics recovered from the execution of the search warrant. Stated differently, the circumstantial evidence presented was sufficient for the trier of fact to infer that defendant had knowledge of the narcotics and controlled the premises where they were discovered.

¶ 26    The record shows that during the execution of the search warrant the officers found defendant in his boxer shorts asleep on the couch in the living room area of the apartment. The officers recovered loose cannabis, a scale and a glass pipe from a table in that room, as well as two pieces of mail in defendant's name and listing the address of the searched residence, including an electric bill that was due the same month the warrant was executed and a LINK card. *People v. Scott*, 367 Ill. App. 3d 283, 286 (2006) ("Proof of residency in the form of rent receipts, utility bills and clothing in the closets is relevant to show defendant lived on the premises where narcotics are found and, therefore, controlled them for the purposes of establishing constructive possession of narcotics.").

¶ 27    In an unlocked second bedroom, there was a safe, containing the cocaine and MDMA, as well as a pair of pants with a wallet containing defendant's State Identification Card and keys which opened the door to the apartment. See *People v. McCarter,* 339 Ill. App. 3d 876, 879 (2003) (control over the area where the contraband was found gives rise to an inference that defendant possessed the contraband); *People v. Chicos*, 205 Ill. App. 3d 928, 935 (1990) (having keys to a residence constitutes evidence of constructive possession); *People v. Spann*, 332 Ill. App. 3d 425, 445 (2002) (defendant had constructive possession of drugs found in an apartment where he "stayed in the apartment, paid rent there, and possessed a key to the apartment"). There was an additional scale and container with sandwich bags and a cutting substance used to dilute cocaine in the kitchen.

¶ 28    Moreover, defendant described himself as the superintendent of the building and admitted to spending 15-20 nights in the apartment**,** "fix[ing] it up" on approximately 20 occasions, and was able to "put the light[s] on" and "have working heaters in the apartment." In addition, defendant testified that he tried to make the apartment a "legitimate household." Defendant also paid the electric bill for the apartment and identified his cat from one of the photographs. He had a flat screen television ordered in his name and delivered to the apartment. Finally, defendant was familiar with the room where the safe was located. He knew there was water damage in the room and that garbage cans were placed in the room to catch leaking water. He also placed a dehumidifier in the room. We have held habitation in or rental of the premises by the defendant is sufficient evidence to prove the requisite control. *People v. Blue*, 343 Ill. App. 3d 927, 939 (2003). This evidence, and the reasonable inferences therefrom, supports the trier of fact's conclusion that defendant was in constructive possession of the narcotics recovered and was, thus, sufficient to

sustain his convictions. *McCarter,* 339 Ill. App. 3d at 879; *People v. Bui,* 381 Ill. App. 3d 397, 420-21 (2008).

¶ 29    Defendant nevertheless argues that there was at least one other person residing in the apartment when the police executed the search warrant and the room where the narcotics were recovered was unoccupied. However, the safe containing the narcotics was recovered from the room where defendant's pants, wallet and keys to the apartment were also recovered. Moreover, this court has previously explained that "[c]onstructive possession is not diminished by evidence of others' access to contraband." *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 27. Defendant's control over the controlled substances and premises could "include joint possession***." *People v. Tates*, 2016 IL App (1st) 140619, ¶ 25. The jury was tasked with the responsibility to weigh the evidence and judge the credibility of the witnesses. This responsibility allows the jury to accept or reject all or part of the testimony of a witness, including the defendant. Accordingly, we are not persuaded by defendant's argument and we cannot say that evidence presented was so improbable or unsatisfactory that there remains a reasonable doubt as to his guilt.

¶ 30    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 31    Affirmed.