NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210506-U

NO. 4-21-0506

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 3, 2022
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARLOS MENDOZA, Defendant-Appellant. | ) Appeal from the ) Circuit Court of ) Champaign County ) No. 19CF113 ) ) Honorable ) Randall B. Rosenbaum, ) Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices DeArmond and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Unless other factors raise reasonable doubt, a defendant's knowledge and possession of contraband can be inferred from the defendant's possession of the premises in which the contraband was found.

(2) A reasonable trier of fact could find, beyond a reasonable doubt, that defendant knew three of the firearms in his constructive possession had been stolen from others.

(3) An objection to multiple hearsay in a sentencing hearing is forfeited unless the defendant objects in the sentencing hearing and raises the issue again in a postsentencing motion; and unless the consideration of the multiple hearsay was a clear or obvious error, the doctrine of plain error affords no possibility of averting the forfeiture.

(4) Absent a clear or obvious error in the consideration of multiple hearsay in the sentencing hearing, it was within the wide range of reasonable professional assistance for defense counsel to refrain from objecting to the multiple hearsay.

¶ 2    In a bench trial, the circuit court of Champaign County found defendant, Carlos

Mendoza, guilty of drug offenses and gun-possession offenses. The court sentenced him to

concurrent terms of imprisonment, the longest of which was 35 years. Also, the court imposed a street-value fine. Defendant appeals on two grounds.

¶ 3          First, he contends the evidence was insufficient to support his convictions of count I of the information, unlawful possession with the intent to deliver methamphetamine (see 720 ILCS 646/55(a)(1) (West 2018)); count X, unlawful possession of a weapon, namely, a "Sten MK II 1943 'grease' gun," by a felon (see 720 ILCS 5/24-1.1(a) (West 2018)); and count XI, aggravated possession of a stolen firearm (see *id.* § 24-3.9(a)(1)). Specifically, he maintains that, as a matter of law, the State failed to prove (1) his knowledge of the methamphetamine and the Sten gun and (2) his knowledge that any of the guns in his possession were stolen. When we view all the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find, beyond a reasonable doubt, the guilty knowledge necessary to sustain those convictions.

¶ 4          Second, defendant contends that, in the sentencing hearing, the circuit court abused its discretion by concluding, on the basis of multiple hearsay, that he was an arms dealer. We hold this contention to be procedurally forfeited. In an attempt to avoid the forfeiture, defendant invokes the doctrine of plain error. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Because the multiple hearsay, however, was partially corroborated, we find no error that was clear or obvious. Consequently, the doctrine of plain error does not avert the forfeiture.

¶ 5          The alternative claim of ineffective assistance of counsel fails because, absent an error that was clear or obvious, it was within the wide range of reasonable professional assistance to refrain from objecting to the asserted error. Besides, whether to object to hearsay is a matter of strategy, and unless defense counsel failed to subject the State's case to any meaningful adversarial

testing, such strategic decisions do not give rise to a valid claim of ineffective assistance. The transcript of the sentencing hearing reveals meaningful adversarial testing.

¶ 6        Therefore, we affirm the judgment.

¶ 7                    I. BACKGROUND

¶ 8                    A. What the Police Found in a Search

¶ 9        On Friday, January 18, 2019, at 11:23 p.m., the police executed a warrant to search a trailer, or mobile home, at 1928 Country Road 3000 North, Lot 33, in Rantoul, Illinois. Upon entering the trailer, the police noticed it smelled like cannabis. Defendant and five teenagers were in the trailer.

¶ 10        In the living room, the police found, tucked into a recliner, a Taurus 9-millimeter pistol. In the couch, they found the magazine to a Glock pistol. On an end table were defendant's wallet and, outside his wallet, his state-issued Illinois identification card. According to the identification card, his address was 1928 Country Road 3000 North, Rantoul, Illinois (without a trailer number). Inside the wallet were credit cards in defendant's name and a McLean County voter registration card issued to him and showing his address to be 1928 Country Road 3000 North, Lot 46 (as distinct from lot 33, where the search was performed).

¶ 11        In the kitchen, the police found three digital scales, shotgun shells, a pill bottle the label of which said the prescription was for Christian Pedro, and what the police suspected to be cannabis.

¶ 12        The trailer had three bedrooms: the south, middle, and north bedrooms.

¶ 13        While searching the south bedroom, the police found, in a dresser drawer, a manila envelope. Inside the manila envelope were the following documents, all of which had defendant's name on them: a document from the United States Department of State, Chicago Passport Agency,

dated September 14, 2018, and issued to defendant at the lot 46 address; an accident report and a McLean County citation, dated November 27, 2018; and defendant's birth certificate. In that same dresser drawer was a toiletry bag containing five bags of heroin. Cash in the amount of $427 was also in the dresser. Elsewhere in the south bedroom was a Chase Bank envelope containing an additional $500 in cash. On an end table in the south bedroom was a prescription pill bottle of benzonatate with defendant's name on the label. People's exhibit No. 2-AF was a photograph of the pill bottle sitting on a brown tabletop. In a closet of the south bedroom were a Kriss Vector 9-millimeter rifle, a Ruger precision rifle, and a Smith & Wesson rifle. Those three rifles had been reported stolen.

¶ 14          In the middle bedroom, which appeared to be used for storage, the police found 93.2 grams of a leafy substance, a large scale, 18 bundles of cannabis, and 2 baggies of methamphetamine. The methamphetamine was hidden in a floor vent.

¶ 15          In the north bedroom, the police found bank statements and correspondence from State Farm, all addressed to Jose Rosales at Lot 33. In the closet of the north bedroom were a Diamondback rifle, an extended magazine for the rifle, and 16 bags of cannabis.

¶ 16          In a hallway closet near the middle and south bedrooms was an unassembled Sten MKII rifle inside a tool bag.

¶ 17                                B. The Body Cam Video

¶ 18          At the time of the search, Detective Cully Schweska had a video camera on his uniform, and the camera recorded him advising defendant of his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant chose to talk. Although defendant said his "address" was lot 46, he told Schweska he "stayed" at lot 33 with his "friend," Rosales. Defendant

explained that the teenagers—including his stepson, Michael Ramos—had been in the trailer at lot 33 for only five minutes. They had come to pick up some money, defendant said.

¶ 19          Schweska asked defendant:

> "Q. Where is your bedroom located at in this house?
>
> A. In the front.
>
> Q. At number 33 here?
>
> A. Yes."

Schweska asked defendant why, then, he had given lot 46 as his address. Defendant answered that lot 46 was "my house." But "I just stay" at lot 33 "off and on," he told Schweska.

¶ 20                              C. The Testimony of Rosales

¶ 21          Rosales testified that although he was not present on January 18, 2019, when the police searched the trailer at lot 33, he lived in the trailer at the time and had a key to it. Rosales further testified that defendant, whose brother owned the trailer park and for whom defendant did maintenance work, also lived in the trailer at lot 33.

¶ 22          When the prosecutor asked Rosales how long defendant had lived in the trailer at lot 33, Rosales at first answered he did not remember. Then the prosecutor asked Rosales:

> "Q. And you remember giving an interview with two detectives, right—
>
> A. Yeah.
>
> Q. —inside the police department?
>
> And do you remember them asking that same question, how long [defendant] had been living with you?
>
> A. I think so. I don't remember really.

Q. And do you remember telling them that they—he had moved in about a year before?

A. I think so."

¶ 23    Next, the prosecutor showed Rosales a photograph of the north bedroom of the trailer at lot 33. After some ambivalence, Rosales admitted he lived in the north bedroom.

¶ 24    Defense counsel asked if, additionally, "an Oscar Perez (phonetic) and another individual used to live there." Rosales answered in the affirmative, but he "didn't pay attention" when exactly those two "left." He explained again, "I work and sleep day and I, I don't really know what time they, they went to work."

¶ 25    Rosales testified he had seen defendant sleeping on the living room couch at lot 33. Defense counsel asked Rosales:

"Q. The middle room, there was a middle room—

A. Yeah.

Q. —that was not [defendant's]?

A. No.

Q. Okay. Do you know who used that room?

A. He had a dog. I think that he put that dog there or something, put it outside or inside because I hear him bark when I get home at midnight."

¶ 26    D. Discoveries of Defendant's DNA and Fingerprints

¶ 27    Emilie Moore, a forensic scientist with the Bureau of Alcohol, Tobacco, Firearms and Explosives, tested the Taurus pistol for DNA evidence (that is, the pistol found in the recliner in the living room). She concluded that the DNA of two persons was on the pistol and that at least one of the contributors was male. Having been provided a known reference sample of defendant's

DNA, Moore concluded that defendant was a "possible contributor" to the DNA on the pistol. Moore explained the term "possible contributor" as follows: "The likelihood ratio value associated with this inclusion states that the DNA profile is at least 1 trillion times more likely if it originated from [defendant] and an unrelated, unknown individual than if it originated from two unrelated, unknown individuals."

¶ 28    On the toiletry bag, Moore found the DNA of at least four individuals, at least two of whom were male. She "determined that there [was] a major component mixture of two individuals," at least one of whom was male. "That major component mixture of two individuals," she explained, "[was] suitable for comparisons while the minor component [was] not suitable for comparisons." She found "evidentiary support for the inclusion of [defendant] to that major component." Moore explained the term "evidentiary support" as follows: "The likelihood ratio value associated with this inclusion states that the DNA profile is 20.9 million times for likely if it originated from [defendant] as a major contributor with three unrelated, unknown individuals than if it originated from four unrelated, unknown individuals."

¶ 29    A fingerprint analyst, Katharine Mayland, examined the digital scale that the police had found in the closet of the middle bedroom. She had been provided a known standard, the fingerprints of defendant. On the battery compartment lid of the digital scale, she found a fingerprint that was a match for defendant's fingerprint.

¶ 30                                    E. Stipulations and Street Values

¶ 31    The parties stipulated that 148 grams of heroin; 5350 grams of cannabis; 2754 grams of additional, untested plant material; and 510 grams of methamphetamine were seized from inside the trailer at lot 33.

¶ 32    Schweska testified that in January 2019 the street value of cannabis was $10 per gram, the street value of methamphetamine was $100 per gram, and the street value of heroin also was $100 per gram.

¶ 33                              F. Judicial Notice

¶ 34    At the prosecutor's request, the circuit court took judicial notice that in Champaign County case No. 09-CF-93 defendant was convicted of unlawfully possessing cannabis with the intent to deliver it, a Class 1 felony.

¶ 35                           G. Defendant's Testimony

¶ 36                       1. *Homes in Texas and Illinois*

¶ 37    Defendant chose to take the stand and testify on his own behalf. In his testimony, he represented essentially as follows.

¶ 38    When defendant was released from prison in 2013, he was "paroled" to lot 46. He had lived at lot 46 for about 17 years. He had a key to the trailer at lot 46, on an Audi key ring, and when the police arrested him in January 2019, the utilities at lot 46 were still in his name. He testified, "[L]ot 46 is my home." He identified defense exhibit Nos. 5 and 6 as electric and gas bills for lot 46, and they were in his name. He voted in Rantoul, Illinois, in November 2018. "So[,] at that point [he] still had residency in Illinois to be able to vote."

¶ 39    Also, according to defendant's testimony, he had "had a home all [his] life in Texas." In July or August 2018, he moved to Mission, Texas, with his girlfriend.

¶ 40    Lately, defendant had been traveling back and forth between his homes in Texas and Illinois. Around the time of his arrest, he had flown from Texas to Illinois three times recently: in November and December 2018 and in January 2019. He identified defense exhibit No. 2 as "the receipt of the flight that [he] booked on [January 12, 2019]."

¶ 41    Defendant gave a couple of reasons for these frequent trips back and forth. For one thing, a court case was pending against him in McLean County, Illinois, for driving on a statutory summary suspension. He was required to attend hearings, one of which was on January 14, 2019. For another thing, defendant's brother owned the trailer park and needed help with maintenance work.

¶ 42    On January 12, 2019, defendant's "son" (whose name appears to be unspecified in defendant's testimony) picked him up from O'Hare Airport and drove him, in the Audi, to Rantoul. Upon arriving at lot 46, defendant found that his roommate, Damon Zaragoza, "ha[d] his kids spending the weekend." ("[Zaragoza] was going through a hard time," defendant explained. "Him and his girlfriend or wife were separated. So I've known him since he was nine years old and I brought him in, gave him a place to stay. And he usually helped with the lot rent.") Because "three boys and a girl" were "staying with [Zaragoza]" at lot 46 for the weekend, defendant decided to stay in the trailer at lot 33.

¶ 43    Defense counsel asked defendant how many times, between his move to Texas and his arrest in January 2019, he had stayed in the trailer at lot 33. Defendant answered, "Not very many. I don't know off the top of my head, but usually when I was using." He denied ever going into the middle bedroom or the north bedroom of lot 33. He usually stayed in the living room. Because Rosales lived in the trailer at lot 33, defendant presumed that Rosales had access to the hallway, kitchen, and dining room. "I wasn't there all the time," defendant reiterated, "only when I was using."

¶ 44    2. *What Defendant Was Doing in the Trailer at Lot 33*

*When the Police Arrived There to Execute the Search Warrant*

¶ 45 Defendant described the trailer at lot 33 as "a trap house" where women exchanged sexual services for drugs and where people were always going in and out. According to defendant, Rosales, who was a "user," had a key to the trailer and lived there. Defendant, however, denied having a key to the trailer at lot 33. The utilities to that trailer were not in defendant's name. (Instead, according to defense exhibit No. 8, the gas and electricity for lot 33 were in Perez's name from early 2018 to March 2020. The record does not appear to reveal anything else about Perez other than, according to defendant's testimony, he used to sleep in the south bedroom.)

¶ 46 Defendant admitted being present in the trailer when the police arrived with their search warrant. Rosales had just left for work. Other people were in the trailer with defendant: Maycoll Paredes (to whom defendant was "like a father figure") and "[s]ome of [Paredes's] friends." All of these juveniles "smoke[d] pot." No one else was in the trailer. According to defendant's testimony, all of them, including defendant, were awaiting the arrival of Christian "Zorillo" Pedro.

¶ 47 Defense counsel asked defendant:

"Q. And that's based on—did he send you a mail, did he text you, or what?

A. Yes, he text me and said if I wanted some drugs or—I am an addict. So I was, I guess, going to score something.

Q. And how long have you been an addict?

* * *

A. I started drinking when I was 12, 13, so most of my life. I've overdosed a couple times. In Texas once and recently here I had a heroin overdose. I was in Carle Hospital."

¶ 48 3. *Defendant's Explanations for Some Items of Forensic Evidence*

¶ 49                                    a. The Digital Scale

¶ 50          Defendant testified that in December 2018 he bought some drugs from Pedro, who along with his girlfriend "stayed at" lot 33. Usually it was Pedro's girlfriend, nicknamed Flaca, who "weighed the stuff out for whoever came and bought, which included [defendant]." Usually, the drugs that defendant purchased from Pedro were weighed in the kitchen at lot 33. Flaca would bring out a large, old scale and set it on the kitchen table. Then she would weigh the drugs before handing them over to defendant.

¶ 51          Defense counsel asked:

> "Q. And what—initially when he or she put the drug on the scale, did it work or didn't work?
>
> A. It was an older scale so you had to play with it a little bit.
>
> Q. Okay.
>
> A. Get it leveled or whatever to weigh correctly.
>
> Q. Okay. And did you have occasion to touch that scale?
>
> A. Yes, to make sure I was getting what I was paying for."

¶ 52                                    b. The Taurus Pistol

¶ 53          The Taurus 9-millimeter pistol, defendant testified, was Pedro's gun, and Pedro had offered to sell it to him. During that brief negotiation, defendant handled the gun—inspected it— but he decided that Pedro wanted too much money for it. Anyway, since defendant would be "flying" out, he could not have a gun on his person. So, he handed the Taurus pistol back to Pedro, declining to buy it—but evidently leaving his fingerprint on the pistol.

¶ 54                                    c. The Toiletry Bag

¶ 55        Defendant slept on the couch in the living room at lot 33. He had blankets and pillows on the couch. Also, his "wallet was there" and his "coveralls or bibs and coat." Defendant explained, "I usually when I'm thawing out the lines I have to get underneath the mobile homes and put a heater on them to thaw them out." He had brought this cold-weather clothing from Texas in his backpack.

¶ 56        Also, in his backpack, he had brought a manila envelope containing documents that, according to him, he needed for his court case in McLean County:

> "My backpack—I had come to court so I had a manila envelope where I had my birth certificate, all my legal work—birth certificate and my marriage license I believe was in there and an application for a—the passport and the legal documents I was—that I needed for the McLean County Court that I had just gone."

Because lot 33 was, as defendant put it, a "trap house" with "people in and out," he wanted to safeguard his documents. So, he took the manila envelope of documents out of his backpack and hid the envelope in a dresser drawer in the south bedroom, covering the envelope with items in the drawer. He must have touched the toiletry bag when moving items aside in the drawer to make room for the envelope and to cover it up. He denied "touch[ing] anything else on that bag other than pushing it aside."

¶ 57        H. The Circuit Court's Decision in the Guilt Phase of the Bench Trial

¶ 58        After the close of evidence, the circuit court found the police officers and the two laboratory experts for the State to be credible. The court found Rosales to be credible only with respect to "some of the most fundamental issues of *** he was living in the north bedroom[ ] and the defendant had been staying there for some amount of time." Otherwise, Rosales's professions of ignorance—or of his supposedly paying little attention to his surroundings—seemed

implausible to the court. As for defendant, the court "ha[d] a hard time believing most of what [he] says."

¶ 59　　　　　The circuit court, however, credited an admission that defendant made when the police arrested him. The court recounted:

"On the body cam, the defendant essentially says that his bedroom where he was staying was the south bedroom, which is the front one. Said he was living there with someone off and on. He lived, quote, in the front. The defense argues that could mean the living room, but, ironically, there are guns in the living room. But the State's inference is living in the front meant the front bedroom, which is the south bedroom, where, in fact, he had personal papers."

¶ 60　　　　　The circuit court found that, except for the north bedroom, which was Rosales's bedroom, defendant had been in control of the trailer at lot 33. The middle bedroom, the court found, was a storage area and, as such, a common area. The hallway closet, the kitchen, and the living room likewise were common areas. Common areas typically were controlled in common by the occupants of the premises. Therefore, the court found defendant to have been in control of the common areas of the trailer at lot 33: the middle bedroom, the hallway closet, the kitchen, and the living room. Defendant's personal papers—the kind of papers that normally would have been kept at home—were found in the south bedroom, tending to confirm that defendant had control of that bedroom as well. Inferring his constructive possession of contraband from his apparent control of the areas where the contraband was found, the court found defendant guilty of all counts except count VIII, which charged him with possessing the firearm seized from Rosales's bedroom (the north bedroom).

¶ 61        Because of the one-act, one-crime rule, however, the court did not enter judgment on count II, concluding that count II should merge into count I.

¶ 62                          I. The Posttrial Hearing

¶ 63        The defense filed a motion for a new trial. The motion argued:

> "[T]he State did not show that [defendant] constructively possessed all the firearms and controlled substances in trailer 33 because [defendant] did not live in trailer 33 and the trailer was frequently used by several other people who came and went when [defendant] lived out of state. As a result, there was zero evidence that [defendant] was aware of most of the items found in the trailer and, even if it can be inferred that he knew about some of them, there was no evidence connecting [him] to the items hidden or stored in the closets and crannies of trailer 33."

(Why the remedy for the asserted failure by the State to carry its burden of proof would be a new trial is unclear.) The motion selectively quoted from *People v. Tates*, 2016 IL App (1st) 140619, ¶ 20: "[P]roof of mere presence, even combined with the presence of narcotics, will not support a finding of constructive possession unless there is other circumstantial evidence of defendant's control over the contraband." (In full, the sentence from *Tates* reads, "*Where there is no evidence that the defendant controls the premises*, proof of mere presence, even combined with the presence of narcotics, will not support a finding of constructive possession unless there is other circumstantial evidence of defendant's control over the contraband." (Emphasis added.) *Id.*)

¶ 64        The circuit court denied the posttrial motion, adhering to its finding of constructive possession. The court explained:

> "I had to look at the totality of the evidence and I had to weigh the credibility of the witnesses. And, frankly, [defendant] testified, and I judged his credibility the same

way I did everybody else's, and I didn't find him believable. And for all those reasons, despite the few fingerprints and DNA, I did find that he constructively possessed the items for which he was convicted."

¶ 65　　　　　The circuit court confirmed, however, that, pursuant to the one-act, one-crime rule, count II had merged into count I.

¶ 66　　　　　The circuit court then raised another concern about the one-act, one-crime rule. Count IX charged defendant with aggravated possession of a stolen firearm in that he possessed two to five firearms, knowing them to be stolen. At the same time, other counts charged him with unlawfully possessing single weapons. In the bench trial, Schweska testified that the Kriss Vector 9-millimeter rifle, the Ruger rifle, and the Smith & Wesson rifle had been reported stolen— evidence relevant to count IX. But those same weapons also were, individually, the subjects of counts V, VI, and VII, each of which charged defendant with unlawful possession of a weapon by a felon (see 720 ILCS 5/24-1.1(a) (West 2018)). The court was concerned about the part of the one-act, one-crime rule providing that "[m]ultiple convictions are improper if they are based on precisely the same physical act" (*People v. Miller*, 238 Ill. 2d 161, 165 (2010)). Defense counsel agreed with the court that, under the one-act, one-crime rule, the convictions on counts V, VI, and VII should be vacated. The prosecutor likewise agreed. Accordingly, the court vacated the convictions on those counts.

¶ 67　　　　　　　　　　　　J. The Sentencing Hearing

¶ 68　　　　　The State called Schweska in the sentencing hearing. He testified he drafted the search warrant after a confidential source reported he had seen more than half a pound of cannabis and more than two ounces of cocaine in the trailer at lot 33. According to the confidential source, defendant "was actively selling these narcotics to various individuals." The confidential source

- 15 -

further reported that defendant had a rifle on the kitchen table in the trailer—a rifle, in fact, that the confidential source had been selling to him.

¶ 69     Schweska further testified he had reviewed a Rantoul police report dated September 23, 2018, that concerned the arrest of a 14-year-old male for theft. According to the police report (as Schweska recounted it in his testimony), this juvenile, when apprehended, had on his person a 9-millimeter Taurus pistol. The prosecutor asked Schweska:

> "Q. Was the juvenile's father interviewed in relation to that firearm?
>
> A. Yes, he was.
>
> Q. And was law enforcement given information about how the juvenile obtained the firearm?
>
> A. Yes.
>
> Q. What information was law enforcement given about how the juvenile came to be in possession of the firearm?
>
> A. Law enforcement was told that the juvenile who was arrested with the firearm had been shown the firearm at the Rantoul High School at approximately three days before his arrest with the firearm. And this was shown to him by an individual identified as Michael (phonetic) Mendoza, who was later identified as the Defendant's son."

¶ 70     Sometime after being shown the pistol, the juvenile decided to buy it. The prosecutor asked Schweska what were the circumstances of the purchase. He answered:

> "A. According to the father, the—his son met Michael Mendoza and [defendant] near the Dairy Queen in Rantoul, Illinois, and purchased the Taurus for approximately $150.

- 16 -

"Q. Was law enforcement provided details about [defendant] from the juvenile or his father?

A. Yes.

Q. What were those specific details that you were given or that law enforcement was given?

A. That the Defendant Mendoza resided at the Bell (phonetic)—Bell Trailer Park at 1938 County Road 10 3000 North, Trailer Number 33 in Rantoul. And that, also, he operated a blue-colored Audi sedan.

Q. Throughout the course of your investigation, were you able to confirm that the Defendant does, in fact, drive a blue Audi sedan?

A. Yes."

¶ 71    On cross-examination, defense counsel asked Schweska:

"Q. Officer, do you—do you verify about this Michael Mendoza selling a weapon? In fact, did you investigate that my client does not have a son by the name of Michael Mendoza?

A. No, I did not follow up on the Rantoul police report specifically."

¶ 72    Before announcing the sentence, the circuit court commented on the reported sale of the pistol to the juvenile:

"There was a report from Rantoul police, and it is hearsay, but hearsay is allowed at a sentencing hearing, the Defendant was involved in some way, shape, or form of selling a gun to a juvenile and a juvenile's father. Those persons indicated that the Defendant did live at 33.

* * *

It's clear to me that [defendant] is a drug dealer. And, now, I'm finding he's an arms dealer as well. And selling to the people he shouldn't be selling it to. Deterrence has to be heard loud and clearly. [Defendant] cannot commit these crimes himself in the future."

See 720 ILCS 5/24-3(A)(a) (West 2018) (providing that a person commits unlawful sale or delivery of firearms when the person knowingly "[s]ells or gives any firearm of a size which may be concealed upon the person to any person under 18 years of age").

¶ 73    The circuit court sentenced defendant to concurrent terms of imprisonment: 35 years for count I, 30 years for count III, 20 years for count IV, 10 years for counts IX and X, and 20 years for count XI. Also, the court imposed street value fines totaling $119,300.

¶ 74    At the conclusion of the sentencing hearing, defense counsel made an oral motion to reduce the sentence. Defense counsel inquired:

"I don't know if you accept that or do we have to file something? This way we—we can file the notice of appeal today if motion to reconsider the sentence.

THE COURT: Well, is there any further argument you would have on your motion?

[DEFENSE COUNSEL]: Basically the same, Judge. That we think that's, basically, almost a life—it is a life sentence for my client. And it should be—it's too excessive for the charges.

THE COURT: Well, I would note the oral motion for—to reduce sentence. That motion is denied."

¶ 75                              II. ANALYSIS

¶ 76         A. The Sufficiency of the Evidence to Prove Counts I and X

¶ 77        Count I charged defendant with unlawfully possessing, with the intent to deliver, methamphetamine in some amount more than 400 grams and less than 900 grams. See 720 ILCS 646/55(a)(1) (West 2018). Count X charged him, a convicted felon, with unlawfully possessing a firearm, specifically, a "Sten MK II 1943 'grease' gun." See 720 ILCS 5/24-1.1(a) (West 2018). In both of those offenses, the *mens rea* is knowledge. See *id.*; 720 ILCS 646/55(a)(1) (West 2018). To prove defendant guilty of count I, the State had to prove, beyond a reasonable doubt, his knowledge of the methamphetamine hidden in the floor vent of the middle bedroom. Likewise, to prove him guilty of count X, the State had to prove his knowledge of the Sten rifle in the hallway closet. According to defendant, the State failed to prove, beyond a reasonable doubt, his knowledge of the methamphetamine and the Sten rifle.

¶ 78        In his challenge to the sufficiency of the *mens rea* evidence, defendant likens himself to the defendant in *People v. Terrell*, 2017 IL App (1st) 142726. *Terrell*, however, is distinguishable because in that case the State failed to present any evidence that the defendant ever entered the residence in which the police found contraband, let alone that he lived there. See *id.* ¶ 31. Habitation would have carried a lot of water in the State's theory of constructive possession. See *id.* ¶ 19.

¶ 79        The appellate court in *Terrell* described the difference between actually possessing contraband and constructively possessing it. See *id.* ¶ 18. Actual possession meant "personal dominion over the contraband." *Id.* By contrast, a person had constructive possession of contraband if, though lacking personal dominion over the contraband, the person had "control of the area where the contraband was found." *Id.* "Generally," the appellate court observed, "habitation of the location where the contraband is found is sufficient evidence of control constituting constructive possession." *Id.* ¶ 19.

¶ 80          Defendant told Schweska, in the body cam video, that he, defendant, "stay[ed]" in the trailer at lot 33 and that his "bedroom" was "[i]n the front." In his testimony in the bench trial, defendant denied telling the police he resided in the trailer at lot 33. To "stay" in a trailer, however, is to take up residence in the trailer—and defendant even identified a bedroom in the trailer as his own. By his own admission, then, defendant inhabited the trailer at lot 33. In addition to this admission by defendant, the record includes the statement by his friend, Rosales, that defendant had been living in the trailer at lot 33 for a year.

¶ 81          It is not our place, as a reviewing court, to retry defendant by deciding anew such factual questions as habitation. See *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Instead, viewing all the evidence in a light most favorable to the prosecution, we should ask whether "*any* rational trier of fact" could find, beyond a reasonable doubt, the elements of counts I and X. (Emphasis in original and internal quotation marks omitted.) *Id.* Drawing all defensible inferences in the State's favor, we should ask whether it would be possible for any reasonable person (considering the question reasonably) to conclude that defendant lived in the trailer at lot 33.

¶ 82          Defendant was present in the trailer when the search warrant was executed. Rosales testified that defendant "had moved in about a year before" and had been sleeping on the couch in the living room. Rosales's testimony, if believed, was sufficient evidence in and of itself that defendant inhabited the trailer at lot 33. See *People v. Acklin*, 2020 IL App (4th) 180588, ¶ 15 (declining to "judge witness credibility" but instead "defer[ring] to the fact finder's credibility determinations"). Perhaps even more significantly, defendant himself admitted to Schweska that he stayed in the trailer and had a bedroom therein.

¶ 83          In short, then, the circuit court could have reasonably found defendant to be an inhabitant of the trailer at lot 33 (a finding not inconsistent with his also having homes in Texas

and at lot 46). "A defendant's proved habitation in the premises where an item is found is sufficient evidence of control of the location to establish [the defendant's] constructive possession" of the item. *People v. Davis*, 2021 IL App (3d) 190040-U, ¶ 13. Defendant's admission that he stayed at lot 33 was supported by other facts, such as the presence of his documents in the dresser drawer, his fingerprint on the digital scale, and his DNA on the Taurus pistol. It also is telling that, apparently, he did not have to ask anyone's permission to (1) spend the night by himself in a trailer containing over $100,000 of contraband and (2) keep a dog at the trailer. All those facts, together with his admission in the body cam video, amply justified an inference that he was an inhabitant of the trailer at lot 33.

¶ 84      Therefore, contraband cases in which the appellate court found no evidence of habitation by the defendant are inapposite. For example, *People v. Maldonado*, 2015 IL App (1st) 131874, cited by defendant, is distinguishable for the same reason that *Terrell* is distinguishable: "the State fail[ed] to present evidence that [the] defendant was ever inside the building" where the contraband was found, let alone that he lived in the building. *Id.* ¶ 41. Significantly, the *Maldonado* court acknowledged that "[h]abitation of the location where contraband is found can constitute sufficient evidence of control to establish constructive possession." *Id.* ¶ 29. The *Maldonado* court further acknowledged that "a defendant's control over the premises where contraband is located gives rise to an inference of knowledge of that contraband." *Id.* ¶ 39. But the *Maldonado* defendant's habitation—and, hence, his control—of the premises was unproven, making the doctrine of constructive possession inapplicable. See *id.* ¶ 42. By contrast, defendant's habitation—and, hence, his control—of lot 33 could reasonably be regarded as proven.

¶ 85      Quoting, however, from *People v. Macias*, 299 Ill. App. 3d 480, 487 (1998), defendant points out, "A defendant's control over an area 'does not necessarily mean that the

defendant has knowledge of the contraband in that area.' " (The appellate court made a similar point in *Maldonado*, 2015 IL App (1st) 131874, ¶ 41.) Because of the qualifier " 'necessarily,' " we agree. The supreme court has held, "[T]he mere presence of illegal drugs on premises which are under the control of the defendant gives rise to an inference of knowledge and possession sufficient to sustain a conviction *absent other factors that might create reasonable doubt as to the defendant's guilt*." (Emphasis added.) *People v. Smith*, 191 Ill. 2d 408, 413 (2000). If, as *Smith* says, "other factors" "might create reasonable doubt," the defendant's knowledge of contraband on the premises is not *automatically* inferred, *in every case*, from the defendant's control of the premises. *Id.*

¶ 86        In *Macias*, for example, the defendant possessed the keys to an apartment in which contraband was hidden, and thus the apartment was under his control. *Macias*, 299 Ill. App. 3d at 482. Even so, some factors created reasonable doubt that the defendant in *Macias* knew of the contraband: the resident of the apartment, who was hospitalized, had given the keys to the defendant only so that the defendant could go and fetch him some clothing—and the State never presented any evidence that the defendant, as of yet, had entered the apartment to perform even that brief errand. See *id.* at 483.

¶ 87        In the present case, we see no comparable factors that, as a matter of law, would preclude the normal inference of knowledge. See *Smith*, 191 Ill. 2d at 413. Granted, the methamphetamine was hidden in a floor vent, and the Sten rifle was disassembled and bagged in a closet. Defendant's personal documents in the dresser drawer might suggest, however, that he had access to storage places in the trailer. Arguably, his fingerprint on the digital scale in a closet suggests he was a participant in the drug trafficking carried on at lot 33 and that, being a participant, he knew where on the premises an especially lucrative drug, methamphetamine, was hidden.

¶ 88        As the circuit court correctly noted, it does not matter if defendant had associates—including, perhaps, Ramos, Pedro, and Perez—who had equal access to the drugs and the guns. A defendant's constructive possession of contraband "is not diminished by evidence of others['] access to the contraband." *People v. Davis*, 2021 IL App (3d) 190040-U, ¶ 13; see also *People v. Hill*, 226 Ill. App. 3d 670, 672-73 (1992); *People v. Williams*, 98 Ill. App. 3d 844, 849 (1981).

¶ 89        Defendant argues, however, that "the two elements of constructive possession," control of the premises and knowledge of the presence of contraband therein, "are distinct and may not be collapsed." He cites *People v. Hampton*, 358 Ill. App. 3d 1029, 1031 (2005), for the following proposition: "asking [the] fact-finder to infer that [the] defendant knew of [a] weapon's presence because he controlled the location where it was found improperly collapsed the elements of constructive possession." To be clear, though, "improperly collaps[ing] the elements of constructive possession" is language that defendant uses, not language the appellate court used in *Hampton*. The inference of knowledge that defendant characterizes, pejoratively, as an "improper collapse" is the very inference the supreme court repeatedly has approved.

¶ 90        In fact, the *Hampton* court specifically acknowledged the holdings of the supreme court in *Smith*, 191 Ill. 2d at 413, and *People v. Nettles*, 23 Ill. 2d 306, 308 (1961): that, if contraband were found on premises under the defendant's control, an inference could be drawn that the defendant had knowledge and control of the contraband. See *Hampton*, 358 Ill. App. 3d at 1031-32. The term "premises," however, usually meant buildings or land rather than automobiles. The *Hampton* court was unconvinced that the logic of *Smith* and *Nettles* applied to a case in which the defendant drove, for the first time, a car belonging to someone else that had a pistol concealed in a sock in the glove box. See *id.* at 1030. Given "[t]he factual particulars" of the constructive-possession cases and "their underlying rationale as explained in *Nettles*," the *Hampton* court held:

- 23 -

"[I]n order for the inference to arise of [the] defendant's knowledge of the handgun within the vehicle's glove compartment, the State had to demonstrate that [the] defendant had regular, ongoing control over the vehicle that he was driving, similar to the regular and ongoing control that one has over his own living quarters." *Id.* at 1032.

¶ 91 Because, in *Hampton*, the State "offered no proof that [the] defendant had any regular, ongoing control over the vehicle in which the weapon was found"—or, for that matter, that he "had ever driven the vehicle prior to the time of the traffic stop" (*id.*)—his knowledge of the weapon could not be reasonably inferred merely from his control of the vehicle (*id.* at 1032-33). Therefore, in the jury trial, the State was required to present other circumstantial evidence that the defendant knew of the pistol in the glove box. *Id.* at 1033.

¶ 92 The *Hampton* court consulted the factors in *People v. Bailey*, 333 Ill. App. 3d 888, 891-92 (2002), "to determine whether the State offered circumstantial evidence from which [the] defendant's knowledge could be inferred." Those factors were as follows:

"(1) the visibility of the weapon from the defendant's location in the vehicle; (2) the amount of time in which the defendant had an opportunity to observe the weapon; (3) gestures or movements by the defendant that would suggest an effort to retrieve or conceal the weapon; and (4) the size of the weapon." *Hampton*, 358 Ill. App. 3d at 1033.

¶ 93 According to defendant, we should apply those four factors to his own case and find his knowledge of the methamphetamine and the Sten rifle to be unproven as a matter of law, just as the appellate court in *Hampton* found the defendant's knowledge of the pistol in the glove box to be unproven as a matter of law (see *id.*). In *Hampton*, though, the appellate court consulted

- 24 -

the four factors from *Bailey* only because, absent evidence of "regular, ongoing control over the vehicle" by the defendant, *Smith* and *Nettles* were inapplicable. In other words, the trier of fact could not reasonably infer, merely from the defendant's one-time operation of the vehicle, that he knew of the pistol in the glove box. See *id.* at 1032-33. In the present case, by contrast, the State presented evidence that defendant had been living at lot 33 for a considerable time—for a year, according to Rosales—and that, except for Rosales's bedroom, he evidently had the run of the place. This habitation amounted to regular, ongoing control of lot 33 (see *id.* at 1032), making the *Bailey* factors inapplicable. As we have discussed, the evidence could be reasonably interpreted as showing that defendant was an established inhabitant who had settled into the trailer at lot 33.

¶ 94 To be sure, defendant gave an explanation for the documents in the dresser just as he gave explanations for his fingerprint on the digital scale and his DNA on the toiletry bag and the Taurus pistol. But the circuit court was not required to accept any "possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Campbell*, 146 Ill. 2d 363, 380 (1992). In other words, the court, as the trier of fact, had the right to disbelieve defendant. "When reviewing the sufficiency of the evidence in a criminal case, it is not the reviewing court's function to retry the defendant, nor should it substitute its own judgment for that of the trier of fact regarding witness credibility or the weight of the evidence." *People v. Anderson*, 2022 IL App (5th) 190404-U, ¶ 26. Contrary to the explanation that defendant gave in his testimony, his birth certificate, his passport, and an old speeding ticket he received in Texas had no apparent relevance to the hearing in McLean County he had flown in to attend—a hearing about driving on a suspended license. The court could reasonably disbelieve he had been carrying all those documents around in his backpack. The court could believe, instead, that the dresser was a more longstanding storage place for defendant's important personal documents. To quote again

from one of the cases that defendant cites, "[i]t is well established that a defendant's control over the premises where contraband is located gives rise to an inference of knowledge of that contraband." *Maldonado*, 2015 IL App (1st) 131874, ¶ 39. The arguable implausibility of defendant's self-portrayal as a transient guest could suggest untruthfulness on his part, which in turn could suggest a consciousness of guilt. See *People v. Shaw*, 278 Ill. App. 3d 939, 951 (1996).

¶ 95        In sum, when all the evidence is viewed in a light most favorable to the prosecution, a rational trier of fact could find, beyond a reasonable doubt, that defendant knew of the methamphetamine in the floor vent and that he knew of the Sten rifle in the hallway closet. See *Collins*, 106 Ill. 2d at 261. An inference of defendant's knowledge and control of those items is, under the evidence, reasonably defensible. The record contains enough evidence to support a finding of constructive possession. Therefore, we affirm the convictions on counts I and X.

¶ 96        B. The Sufficiency of the Evidence to Prove Count XI

¶ 97        Count XI charged defendant with aggravated possession of a stolen firearm in that he allegedly "possessed at least [two] but not more than [five] firearms at the same time, not being entitled to the possession of said firearms and knowing the firearms to have been stolen." See 720 ILCS 5/24-3.9(a)(1) (West 2018). An element of that offense is that defendant "[knew] the firearms to have been stolen." *Id.* That element, he argues, was as a matter of law unproven.

¶ 98        The State disagrees, citing an argument the prosecutor made to the circuit court. In his argument, the prosecutor acknowledged the State's burden of proving defendant's knowledge that the firearms were stolen. For the following reasons, the prosecutor maintained that the State had carried that burden:

> "[A]s the defendant disclaimed any ownership of the firearms, he was not able to provide an explanation as to where he received these firearms from. The defendant

- 26 -

clearly did not legally purchase the firearms as he does not have a [firearm owner's identification card], and is not able to possess firearms, so the only assumption that can be made is that the defendant purchased or otherwise obtained the firearms on the 'black market', and when one purchases items in that manner, it can be reasonably assumed that the items are in fact stolen."

¶ 99        Under Illinois law, a trier of fact may "infer the defendant's culpable state of mind from his exclusive and unexplained possession of recently stolen property." *People v. Nivens*, 239 Ill. App. 3d 1, 6 (1992). As the prosecutor observed, defendant's testimony included no explanation of how the stolen firearms had come to be in the trailer, which the circuit court found defendant to inhabit and control (except for Rosales's bedroom). Although the record does not appear to reveal when the firearms were stolen, "time is not the only element to be considered, but attention must also be given to the circumstances and character of the goods." (Internal quotation marks omitted.) *People v. Funches*, 212 Ill. 2d 334, 344 (2004). One of those circumstances was defendant's felony record, which prevented him from obtaining firearms through legal means. See 430 ILCS 65/2(a)(1), 4(a)(2)(ii), 8(c) (West 2018); 720 ILCS 5/24-1.1(a), 24-3(A)(k)(i) (West 2018). Another circumstance was the number of stolen firearms, three of them. The more items of stolen property that are found in a person's possession, the less plausible is the person's supposed unawareness that they were stolen. Finally, a reasonable trier of fact could take into account the character of the goods: they are firearms, which are widely known to be prime targets of burglaries.

¶ 100        Granted, guns can be purchased through straw men, and probably—especially on the black market—not everyone asks for a firearm owner's identification card before selling a gun (see *id.* § 24-3(A)(i)). Even so, a defendant can have "knowledge" of a fact without being certain of the fact. "Knowledge of a material fact includes awareness of the substantial probability that

the fact exists." *Id.* § 4-5(a). Realistically, anyone who finds himself in possession of a "trap house," as defendant called it, well-stocked with illegal drugs and bristling with guns of obscure provenance would be aware of a substantial probability that the guns were stolen—or so a reasonable trier of fact could infer. Because "an inference of defendant's knowledge can be drawn from the surrounding facts and circumstances," we decline to disturb the finding of guilt on count XI. *People v. Ferguson*, 204 Ill. App. 3d 146, 151 (1990).

¶ 101                    C. Consideration of Hearsay in the Sentencing Hearing

¶ 102          When Schweska testified to what the police report said that the juvenile's father had said, his testimony was, defendant argues, triple hearsay. Defendant acknowledges that, in sentencing hearings, hearsay is "not *per se* inadmissible *** as unreliable or as denying a defendant's right to confront accusers." *People v. Foster*, 119 Ill. 2d 69, 98 (1987). Nevertheless, defendant cites *People v. Tigner*, 194 Ill. App. 3d 600, 607 (1990), in which the appellate court remarked that "[d]ouble hearsay" in sentencing hearings "should be corroborated, at least in part, by other evidence."

¶ 103          In the sentencing hearing, though, defendant never objected to Schweska's testimony on the ground that it was uncorroborated multiple hearsay. "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Even if, absent objection, a postsentencing motion could be oral instead of written (see *People v. Davis*, 356 Ill. App. 3d 725, 731 (2005)), defendant's oral motion to reduce his sentence did not "rais[e] the issue" of multiple hearsay or reliability (*Hillier*, 237 Ill. 2d at 544).

¶ 104          Recognizing the possibility of a procedural forfeiture, defendant invokes the doctrine of plain error. He claims that the evidence in the sentencing hearing was closely balanced

(see *id.* at 545)—meaning that the aggravating and mitigating factors were closely balanced (see *People v. Hall*, 195 Ill. 2d 1, 18 (2000))—and that the doctrine of plain error, therefore, should avert any forfeiture.

¶ 105        Before deciding whether it is true that the mitigating factors offset, or nearly offset, the aggravating factors, we should decide a different question—a threshold question. To obtain relief under the plain-error doctrine, a defendant "must first show that a clear or obvious error occurred." *Id.* at 545. The appellate court has explained:

> "[U]nder the plain error doctrine, the existence of an error is not enough to avert a forfeiture, even if the error is genuinely an error. Not even reversible error is enough. *** The plain error doctrine is not a backdrop to catch merely arguable issues that could have been raised in the trial court. The error had to be manifest or patent." *People v. Hammons*, 2018 IL App (4th) 160385, ¶ 17.

¶ 106        If indeed the circuit court erred by considering the triple hearsay of Schweska's testimony, we are unconvinced that the error was manifest or patent. Arguably, the hearsay was partly corroborated. *Tigner* requires not total corroboration but corroboration "at least in part." *Tigner*, 194 Ill. App. 3d at 607. To corroborate a proposition is to support it by evidence. Although the record does not totally corroborate the police report, the record could be regarded as partly doing so. Defendant or his "son" (or stepson) had a blue Audi automobile, and defendant occupied the trailer at lot 33—just as the father of the juvenile stated to the police. As the search revealed, the trailer was well-stocked with guns. We cannot say it would be unreasonable to infer that the guns, like the drugs, were inventory to be sold. Given those points of partial corroboration by other evidence, the asserted error in the consideration of Schweska's hearsay testimony is less than clear or obvious. See *Hillier*, 237 Ill. 2d at 544; *Tigner*, 194 Ill. App. 3d at 607.

¶ 107    After all, the supreme court has said, "[T]hat the testimony complained of [is] hearsay [is] not pertinent to its admission" in a sentencing hearing. *People v. Brisbon*, 106 Ill. 2d 342, 365 (1985). The pertinent question is not whether the testimony is hearsay, double hearsay, or triple hearsay. The pertinent question is whether the testimony—hearsay or not—is relevant and reliable. See *id.* at 365.

¶ 108    On appeal, defendant challenges both relevance and reliability. As for relevance, he claims the record lacks any evidence that he had anything to do with the sale of the pistol to the juvenile. We are unconvinced. The father reported that "his son met Michael Mendoza and [defendant] near the Dairy Queen in Rantoul, Illinois, and purchased the Taurus for approximately $150." The implication of the father's statement is that his son bought the pistol not only from Michael but also from defendant. In other words, the transaction was with Michael and defendant. The juvenile met with them both specifically for the purpose of buying the pistol. Arguably, the armory in the trailer that was under defendant's control supports the inference that defendant was one of the sellers of the pistol.

¶ 109    The remaining part of the threshold question, then, is whether the police report and Schweska's summary of it on the witness stand clearly or obviously failed the reliability test. See *Hillier*, 237 Ill. 2d at 545. The answer is no. See *Foster*, 119 Ill. 2d at 99 (holding that, although it was uncorroborated, a police officer's testimony was "not inherently unreliable," in part because "the officer compiled the information during an official investigation"). The information in the police report, as recounted by Schweska, dovetails with other evidence. Granted, defendant had, as he points out, a stepson named Michael Ramos instead of a son named Michael Mendoza. But even this minor discrepancy seems a double-edged sword that is somewhat sharper on defendant's side. There was, in fact, a Michael associated with defendant who could have showed the juvenile

a pistol at the school, consistently with the statement the juvenile's father made to the Rantoul police.

¶ 110      So, we are unconvinced that the circuit court clearly abused its discretion by relying on Schweska's hearsay testimony, together with the other evidence, to conclude that defendant was not only a drug dealer but also an arms dealer. Abuse of discretion, after all, is the most deferential standard of review recognized by law (*In re D.T.*, 212 Ill. 2d 347, 356 (2004))—and on top of that great deference is the clearness requirement of the plain error doctrine. Absent an error that was clear or obvious, the procedural forfeiture of defendant's sentencing issue will be honored. See *Hillier*, 237 Ill. 2d at 545.

¶ 111      No plain error means no ineffective assistance of counsel. If the error in considering Schweska's hearsay testimony was less than clearcut, "it was 'within the wide range of reasonable professional assistance' to refrain from objecting to the testimony." *People v. Banks*, 2021 IL App (4th) 180838-U, ¶ 52 (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)).

¶ 112      The claim of ineffective assistance fails for an additional reason. Decisions as to which objections to raise are matters of trial strategy, and unless defense counsel failed to subject the State's case to " 'any meaningful adversarial testing,' " matters of strategy cannot serve as the basis of a claim of ineffective assistance. *People v. Tornez-Sanchez*, 2022 IL App (2d) 210149-U, ¶ 24 (quoting *People v. Patterson*, 217 Ill. 2d 407, 441 (2005)). In the sentencing hearing, defense counsel subjected Schweska's hearsay testimony to some meaningful adversarial testing. He asked Schweska on cross-examination:

> "Q. Officer, do you—do you verify about this Michael Mendoza selling a
> weapon? In fact, did you investigate that my client does not have a son by the name
> of Michael Mendoza?

A. No, I did not follow up on the Rantoul police report specifically."

Thus, through cross-examination, defense counsel impliedly made the same argument that would have been made by a multiple-hearsay objection: Schweska's hearsay testimony was unreliable, and deserved little weight, because Schweska had made no effort to verify the hearsay—Schweska had even failed to verify that defendant had a son named Michael Mendoza. See *Foster*, 119 Ill. 2d at 98 (holding that, in a sentencing hearing, a hearsay objection goes to the weight, rather than the admissibility, of the testimony). Because defense counsel pushed back against Schweska's testimony in a meaningful way, the lack of a hearsay objection gives rise to no valid claim of ineffective assistance. See *Tornez-Sanchez*, 2022 IL App (2d) 210149-U, ¶ 24.

¶ 113                                  III. CONCLUSION

¶ 114          For the foregoing reasons, we affirm the circuit court's judgment.

¶ 115          Affirmed.